**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-20-08190-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| SuperTherm Incorporated, Roberto Guerra, and Susana Guerra, | |
| Defendants. | |

In this action, the Federal Trade Commission ("FTC") alleges that SuperTherm Incorporated ("SuperTherm") and its two sole officers and employees, Roberto and Susana Guerra (the "Guerras") (collectively, "Defendants"), have made false or unsubstantiated performance claims about their building insulation coating products, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (Doc. 1.) Now pending before the Court is the FTC's motion for default judgment and permanent injunction. (Doc. 18.) For the following reasons, the motion is granted.

**BACKGROUND**

I.   Factual Background

The following facts are derived from the FTC's complaint. (Doc. 1.) SuperTherm is an Arizona corporation that advertises, markets, distributes, or sells "MultiCeramics Insulation" coating for residential and commercial applications to consumers throughout the United States. (*Id.* ¶¶ 9, 13.) Roberto Guerra is SuperTherm's founder and principal and Susana Guerra is SuperTherm's president and director. (*Id.* ¶¶ 10-11.) The Guerras

are SuperTherm's sole officers and employees and are responsible for its day-to-day management and the development of its advertising and marketing materials. (*Id.* ¶ 25.)

Since at least 2014, Defendants have advertised and promoted MultiCeramics Insulation on their website and through other media. (*Id.* ¶ 16.) In their promotional materials, Defendants claim that MultiCeramics Insulation "provides R equivalent 'RE' insulation" and describe the product as "Multi-Ceramics Insulation Coating RE19." (*Id.* ¶ 17.) R-value measures resistance to heat flow: "The greater the R-value, the greater the reduction in heat flow, and the more energy may be saved to heat or cool a building." (*Id.* ¶ 18.) Different materials have different R-values. (*Id.* ¶ 19.) For example, fiberglass batt has an R-value of between R-3.0 to R-3.8 per inch, while polyisocyanurate or polyurethane foam have R-values of R-5.6 to R-8.0 per inch. (*Id.*) Generally, these materials must be applied several inches thick to achieve the desired level of insulation. (*Id.*) Common building materials have much lower R-values (absent insulation coating): hardwood, for example, has a value of R-0.9 per inch and concrete has a value of R-0.08 per inch. (*Id.*)

Defendants' marketing materials claim their product is an "R Equivalent INSULATION COATING THAT REALLY WORKS!" (*Id.* ¶ 23.) They also claim that MultiCeramics Insulation "INSULAT[ES] WITH A SINGLE COAT NOT THICKER THAN A BUSINESS CARD," provides "R Equivalence with a 0.007 coat," and "features an insulating factor only slightly less than products up to 20 times its thickness." (*Id.* ¶ 24.)[1]

In reality, MultiCeramics Insulation's coatings "do not significantly restrict heat flow, much less to the extent claimed by Defendants." (*Id.* ¶ 26.) In fact, "the R-value of MultiCeramics Insulation coatings applied at the recommended thickness is considerably less than one." (*Id.*)

II.   Procedural History

On April 15, 2019, the FTC sent SuperTherm "a letter asking for information related

---

[1]   This final claim applies only to the MultiCeramics Insulation roofing system. (Doc. 1 ¶ 24.)

- 2 -

to its marketing of the R-Value and R-Value equivalence of its products" and requesting information on sales, prices, and promotional expenditures related to MultiCeramics Insulation. (Doc. 18-1 at 3 ¶ 4, 8-16.)

In May 2019, Defendants produced some, but not all, of the information the FTC had requested. (*Id.* at 3 ¶ 6.)

In June 2019, Defendants stopped responding to the requests contained in the April 15, 2019 letter. (*Id.* at 3 ¶ 8.)

On October 1, 2019, the FTC sent Defendants a proposed complaint and an offer to discuss a settlement. (*Id.* at 3 ¶ 9.) "There were preliminary settlement discussions but Defendants stopped communicating with the FTC and no settlement was reached." (*Id.*)

On July 28, 2020, the FTC filed the complaint. (Doc. 1.)

On August 5, 2020, the FTC served Defendants with the complaint and summonses. (Docs. 9-11.)

On August 17, 2020, the FTC served Defendants with the Court's preliminary order (Doc. 8) via mail and email. (Doc. 12.)

Defendants did not timely answer or otherwise respond to the complaint and have not done so to date.

On September 10, 2020, the FTC filed an application for entry of default against Defendants. (Doc. 13.) The FTC sent Defendants a copy of the application. (Doc. 18-1 at 4 ¶¶ 14-15, 6 ¶ 33.)

On September 11, 2020, the Clerk entered default. (Doc. 14.)

On October 1, 2020, Roberto Guerra reached out on behalf of all Defendants to express interest in settling the dispute. (Doc. 18-1 at 4 ¶ 17.)

On October 2, 2020, the FTC sent Roberto Guerra an email requesting sales and financial information needed to facilitate settlement and for Defendants to fill out financial disclosure forms. (*Id.* at 4 ¶ 18.) Roberto Guerra said he would produce the requested information by October 16, 2020, but the information was not ready by that date (or months later), despite representations that the information was forthcoming. (*Id.* at 4 ¶¶ 20-23.)

On January 8, 2021, the Court issued an order to show cause why the case should not be dismissed for failure to prosecute. (Doc. 15.) The FTC sent Defendants a copy of this order. (Doc. 18-1 at 5-6 ¶ 33.)

On January 22, 2021, the FTC filed a memorandum showing cause why the case should not be dismissed. (Doc. 16.) The FTC noted, among other things, that "the delay [was] the result of the parties attempting to come to a negotiated resolution of the matter." (*Id.* at 2.) The FTC sent Defendants a copy of the memorandum. (Doc. 18-1 at 5-6 ¶ 33.)

On January 25, 2021, the Court ordered that the FTC either move for default judgment or seek voluntary dismissal by March 26, 2021, and that any motion to set aside the entry of default was due on the same date. (Doc. 17.) The Court further ordered that the FTC provide a copy of the January 25, 2021 order to Defendants. (*Id.*)

On January 26, 2021, the FTC emailed Defendants the January 25, 2021 order. (Doc. 18-1 at 5-6 ¶¶ 25, 33.)

On January 30, 2021 and February 1, 2021, Roberto Guerra emailed SuperTherm's income tax returns for 2015 to 2019 to the FTC, although this was not responsive to all of the financial and sales information the FTC had earlier requested. (*Id.* at 5 ¶¶ 26-27.)

On March 3 and March 4, 2021, Defendants produced additional, but still not all, of the financial information the FTC had requested. (*Id.* at 5 ¶ 30.)

On March 10, 2021, the FTC requested that Defendants provide the missing information. (*Id.* at 5 ¶ 31.) The FTC never heard back from Defendants about this request. (*Id.* at 5 ¶ 32.)

On March 26, 2021, the FTC filed the motion for default judgment. (Doc. 18.) The FTC served the motion on the Defendants via mail and email. (Doc. 18 at 22.)

On April 9, 2021, Defendants, via counsel, requested an extension of time to respond to the motion for default judgment (Doc. 19), which the Court granted (Doc. 20).

On April 26, 2021, the FTC filed a supplemental brief in support of the motion for default judgment. (Doc. 21.) In the supplemental brief, the FTC withdrew its request for equitable monetary relief in light of the Supreme Court's decision in *AMG Capital*

*Management, LLC v. FTC*, 141 S. Ct. 1341 (2021). (*Id.*)

On April 29, 2021, Defendants' counsel filed a stipulation on behalf of Defendants and the FTC seeking another extension of time "so the parties [could] continue settlement discussions." (Doc. 22.) The Court granted the stipulation, extending the deadline to respond to May 5, 2021. (Doc. 23.) That deadline expired about three months ago, yet Defendants still have not responded to the motion for default judgment.

## DISCUSSION

I. Motion for Default Judgment

The "decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). The following factors, known as the *Eitel* factors, may be considered when deciding whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6) whether the default was due to excusable neglect, and (7) the policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

"[T]he general rule" for default judgment purposes "is that well-pled allegations in the complaint regarding liability are deemed true." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). "The district court is not required to make detailed findings of fact." *Id.* "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992), *superseded by statute on other grounds as recognized in United States v. Lozano*, 2020 WL 905676, *3 (S.D. Cal. 2020).

A.  **The First *Eitel* Factor—Possible Prejudice To Plaintiff**

The first factor weighs in favor of default judgment. Prejudice to the FTC is obvious—if the motion for default judgment were denied, the FTC would be without other recourse. *FTC v. DiscountMetalBrokers Inc.*, 2017 WL 6940502, *3 (C.D. Cal. 2017) ("Without default judgment, Plaintiff is unable to . . . prevent recurrence of the wrongful conduct. Therefore, this factor favors entry of a default judgment."); *PepsiCo, Inc. v. Cal.*

*Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery.").

### B.     **The Fifth *Eitel* Factor—Possible Disputes Of Material Facts**

The fifth factor weighs in favor of default judgment. Because of Defendants' failure to participate (apart from seeking and obtaining two extensions of time to respond), there is no dispute over material facts. *Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists.").

### C.     **The Sixth *Eitel* Factor—Excusable Neglect**

The sixth factor weighs in favor of default judgment or is neutral. Excusable neglect is exceedingly unlikely in this case. Defendants first became aware of an FTC investigation in April 2019 (Doc. 18-1 at 3), have received notice of this lawsuit and the possibility of a default judgment on many occasions since then, later sought and obtained two extensions of time, yet ultimately failed to respond. *Cf. Laser Spine Inst., LLC v. Playa Advance Surgical Inst., LLC*, 2020 WL 5658711, *4 (C.D. Cal. 2020) ("As Defendants have received ample warnings and sufficient notice concerning the grounds for default judgment, th[e sixth] factor favors entry of default judgment."); *PepsiCo*, 238 F. Supp. 2d at 1177 ("Although Defendant did not respond to the Complaint, he contacted Plaintiffs' counsel to discuss settlement of the matter . . . . Subsequently, Plaintiffs have made numerous, albeit unsuccessful, attempts to contact Defendant to achieve a settlement of this matter. Given Defendant's early participation in the matter, the possibility of excusable neglect is remote.").

### D.     **The Seventh *Eitel* Factor—Policy Favoring A Decision On The Merits**

The seventh factor generally weighs against default judgment, given that cases "should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, the existence of Rule 55(b) of the Federal Rules of Civil Procedure, which authorizes default judgments, "indicates that this preference, standing alone, is not

dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation marks omitted).  Put simply, "the default mechanism is necessary to deal with wholly unresponsive parties who otherwise could cause the justice system to grind to a halt.  Defendants who appear to be 'blowing off' the complaint should expect neither sympathy nor leniency from the court." 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 55, at 123-24 (2021) (footnote omitted).

### E. The Fourth *Eitel* Factor—The Amount Of Money At Stake

As noted, the FTC no longer seeks any equitable monetary relief, asking only for a permanent injunction.  (Doc. 21.)  This favors granting default judgment.  *PepsiCo, Inc.*, 238 F. Supp. 2d at 1176-77 ("In the instant case, Plaintiffs are not seeking monetary damages.  They seek only injunctive relief . . . . [so] this factor favors granting default judgment.").

### F. The Second And Third *Eitel* Factors—Merits And Sufficiency

That leaves the second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint.  "These two factors are often analyzed together and require courts to consider whether a plaintiff has state[d] a claim on which [it] may recover." *Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (alterations in original) (internal quotation marks omitted).  "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Id.*

The complaint asserts a single count of making false or unsubstantiated performance claims in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  (Doc. 1 ¶¶ 30-32.) "Section 5 of the FTC Act prohibits, *inter alia,* 'unfair or deceptive acts or practices in or affecting commerce.'" *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).  An act or practice is deceptive if: (1) "there is a representation, omission, or practice," that (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "the representation, omission, or practice is material." *Id.* (footnotes and internal quotation marks omitted).  "Deception may be found based on the 'net impression' created by a representation." *Id.* (citation omitted).

The FTC has sufficiently alleged all three requirements of a deceptive act or practice and has thus established the merits of its claim.

First, the FTC has established that Defendants engaged in a practice of representing that MultiCeramics Insulation provides R-value equivalent insulation with a very thin layer of coating. (Doc. 1 ¶¶ 17-24, 26.) The complaint is accompanied by six exhibits comprising Defendants' MultiCeramics Insulation promotional and informational materials, at least three of which demonstrate the existence of multiple representations about the insulating power of MultiCeramics insulation. (Docs. 1-2, 1-3,1-4.)[2]

Second, the FTC has shown that these representations are likely to mislead consumers acting reasonably under the circumstances. "In demonstrating that a representation is likely to mislead, the FTC must establish that (1) such representation was false or (2) the advertiser lacked a reasonable basis for its claims." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012). *See also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) (setting out the "falsity" and "reasonable basis" theories of establishing that a representation is misleading). As noted, a representation may be misleading based on the "net impression" it conveys, even if "every sentence separately considered is literally true." *John Beck*, 865 F. Supp. 2d at 1066. The FTC's allegations, taken as true, establish that Defendants' representations were false. In particular, Defendants represented that their product provides "R Equivalence with a 0.007 coat" and insulates "with a single coat no thicker than a business card," even though when applied at the recommended thickness, the product's R-value "is considerably less than one." (Doc. 1 ¶¶ 24, 26.) Further, as noted, some of Defendants' materials suggest that MultiCeramics Insulation has an R-value equivalent of "RE19," which is a much higher R-value than the product has when applied as recommended. (*Id.* ¶¶ 17-24, 26.) At a minimum, the FTC has established that these representations lack a reasonable

---

[2] These documents are part of the complaint. *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987) ("If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. The[] documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim.") (citation omitted).

basis: nothing in the promotional materials states what substantiation Defendants relied on for their representations. *Cf. John Beck*, 865 F. Supp. 2d at 1067 ("Defendants have the burden of establishing what substantiation they relied on for their product claims."). Finally, even if some of the representations in the materials are truthful, the net impression is still misleading: the representations, taken together, suggest that MultiCeramics Insulation is able to provide high R-value, effective insulation even when only a very thin coat is applied, which is inaccurate. Thus, even if some product claims—such as that MultiCeramics Insulation is an "R equivalent" coating—were, under some reasonable definition of R-value equivalency, literally true, the overall impression is that a very thin coat of MultiCeramics Insulation can act as a stand-in for thicker coatings, when in fact MultiCeramics' R-value "is considerably less than one." (Doc. 1 ¶ 26.) *Cf. FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

Third, the representations are material. "A misleading impression created by a solicitation is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Id.* at 1201 (internal quotation marks omitted). "Express product claims are presumed to be material . . . ." *Pantron I Corp.*, 33 F.3d at 1095-96. Implied product claims are also material "when they pertain to the central characteristics of the products or services." *John Beck*, 865 F. Supp. 2d at 1076 (internal quotation marks omitted). Defendants expressly represent that MultiCeramics Insulation effectively insulates when a thin coating is applied, which addresses a central aspect of the product that is important to consumers.

In sum, taken as true, the allegations in the complaint suffice to state a claim on which the FTC may recover.

G. **The Guerras' Individual Liability**

The FTC argues the Guerras may be held personally liable for the misrepresentations outlined above. The Court agrees.

"Individuals may be held liable for injunctive relief based on corporate entity violations of the FTC Act if (1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014).

As explained above, SuperTherm made misrepresentations. As for the individuals' participation, according to the complaint, Roberto Guerra "is responsible for [SuperTherm's] product development and prepares the advertisements for the MultiCeramics Insulation coatings" and co-managed the company's day-to-day operations, including its website and marketing materials. (Doc. 1 ¶ 25.) Susana Guerra, the other person in this two-person company, is SuperTherm's President and Director and controlled and managed the company's day-to-day operations, including its website and marketing materials. (*Id.* ¶¶ 11, 25.) Thus, at a minimum, Roberto Guerra participated directly in the violations and Susana Guerra had the authority to control SuperTherm when the violations were committed.

## II. Permanent Injunction

### A. **Whether An Injunction Should Issue**

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." This section authorizes the Court "to permanently enjoin defendants from violating the FTC Act if there is some cognizable danger of recurring violation." *FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)), *aff'd*, 265 F.3d 944 (9th Cir. 2001).

Further, the FTC may seek "injunctive relief . . . [in] any case involving a law enforced by the FTC." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086-87 (9th Cir. 1985). The FTC's authority to seek such relief is not, in other words, "limit[ed] . . . to cases involving 'routine fraud' or violations of previously established FTC rules." *Id.* Nor is the FTC's authority to seek permanent injunctive relief under § 13(b) "condition[ed] . . . upon

the initiation of administrative proceedings." *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir. 1982). Instead, the FTC possesses "the power to seek an injunction in the district court in proper cases without also initiating administrative proceedings." *Id.*

It should be noted that, in *AMG Capital*, the Supreme Court overruled existing Ninth Circuit law in one respect, by holding that the FTC may not obtain a particular category of relief—"equitable monetary relief such as restitution or disgorgement"—pursuant to its authority under § 13(b) to seek a permanent injunction. *AMG Capital*, 141 S. Ct. at 1344 ("Section 13(b) of the Federal Trade Commission Act authorizes the Commission to obtain, 'in proper cases,' a 'permanent injunction' in federal court against 'any person, partnership, or corporation' that it believes 'is violating, or is about to violate, any provision of law' that the Commission enforces. The question presented is whether this statutory language authorizes the Commission to seek, and a court to award, equitable monetary relief such as restitution or disgorgement. We conclude that it does not.") (citation omitted). Nevertheless, this holding is not "clearly irreconcilable" with the Ninth Circuit's previous holdings in *H.N. Singer* and *Evans Products* that the FTC may (as in this case) rely on § 13(b) to seek a permanent injunction to restrain conduct that violates a law the FTC is tasked with enforcing (*i.e.,* § 5 of the FTC Act), irrespective of whether the FTC has initiated administrative proceedings related to that conduct and irrespective of whether the conduct qualifies as "routine fraud" or violates a rule promulgated by the FTC. To the contrary, *AMG Capital*'s recognition that § 13(b) broadly authorizes the FTC to seek a permanent injunction concerning "any provision of law the Commission enforces" seems to reaffirm—or, at a minimum, does not disturb—*H.N. Singer*'s and *Evans Products*' recognition that a permanent injunction may issue under § 13(b) without regard to the existence of administrative proceedings, "routine fraud," or the violation of an FTC-promulgated rule. *See also AMG Capital*, 141 S. Ct. at 1348 (recognizing that the text of § 13(b) can be interpreted "as granting authority for the Commission to . . . dispense with administrative proceedings to seek what the words literally say (namely, an injunction)"); *id.* at 1349 ("The Commission may obtain monetary relief by first invoking its

administrative procedures and then § 19's redress provisions . . . [and] may use § 13(b) . . . when it seeks only injunctive relief."). Accordingly, *H.N. Singer*'s and *Evans Products*' holdings on those points remain binding on district courts within the Ninth Circuit. *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (concluding, in response to the question of "when, if ever, a district court . . . is free to reexamine the holding of a prior [Ninth Circuit] panel in light of an inconsistent decision by a court of last resort on a closely related, but not identical issue," that "the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable").

This narrow interpretation of *AMG Capital* is further supported by *FTC v. Hoyal & Associates, Inc.*, 2021 WL 2399707 (9th Cir. 2021). There, the district court granted a permanent injunction and issued monetary relief in an FTC enforcement action under § 13(b) predicated on deceptive marketing practices that violated § 5 of the FTC Act. *Id.* at *1. While the case was on appeal, *AMG Capital* was decided. Although the Ninth Circuit proceeded to vacate the monetary portion of the judgment based on *AMG Capital*, it otherwise affirmed the permanent injunction. *Id.* at *2. In the course of doing so, it observed that "[w]e have long held that the FTC can obtain injunctive relief without initiating administrative proceedings" and continued to cite *H.N. Singer* and *Evans Products* as good law on issues unrelated to the availability of monetary relief under § 13(b). *Id.* Accordingly, the Court is satisfied that the FTC's request for permanent injunctive relief in this case (*i.e.,* a request arising under § 13(b), predicated on a violation of § 5, unaccompanied by administrative proceedings and untethered to the violation of an FTC-promulgated rule) remains legally viable under Ninth Circuit law.

Turning back to the merits, the FTC argues that Defendants' misrepresentations constituted "systematic wrongdoing," and therefore there is a cognizable danger of recurring violation. (Doc. 18 at 11-13.) The Court agrees. Taken as true, the allegations in the complaint establish that Defendants' misrepresentations were ongoing from 2014 to 2020. (Doc. 1 ¶¶ 16, 21.) This pattern of misconduct, combined with the Guerras'

continued ownership of two additional Arizona companies that appear to be engaged in a similar line of business (Doc. 18-1 at 6 ¶ 36), suggests there is a "cognizable danger of recurring violation." Although SuperTherm was dissolved in October 2020 (Doc. 18-1 at 6 ¶ 34), absent an injunction the Guerras—whether as individuals, through one of their companies, or through a reconstituted SuperTherm—could continue to misrepresent the insulation capacity of MultiCeramics Insulation. *Cf. DiscountMetalBrokers Inc.*, 2017 WL 6940502 at *7 (granting default judgment and permanent injunction against company and individual defendants where their "business practices . . . over the course of time [the company] was operating demonstrate a pattern of systematic wrongdoing, rather than mere isolated events"). *See also Grant Connect*, 763 F.3d at 1105 (holding injunction applying to multiple corporate entities and individuals involved in a common scheme was not overbroad). Accordingly, a permanent injunction against all three Defendants is warranted.

### B.     Scope

An injunction must bear a "reasonable relation to the unlawful practices found to exist." *Grant Connect*, 763 F.3d at 1105. In considering the proper scope of a permanent injunction, courts consider: "(1) the seriousness and deliberateness of the violation; (2) [the] ease with which the violative claim may be transferred to other products; and (3) whether the [defendant] has a history of prior violations." *Id.* The FTC "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." *Id.* (quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)). Those "'caught violating' the FTC Act 'must expect some fencing in.'" *Id.* (quoting *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957)). "Accordingly, injunctive relief under the FTC Act may be framed 'broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements.'" *Id.* (quoting *FTC v. Colgate—Palmolive Co.*, 380 U.S. 374, 395 (1965)).

The FTC seeks a permanent injunction that, in brief:

(1) prohibits Defendants (and their officers, agents, employees, attorneys, "and all other persons in active concert or participation with any of them") from misrepresenting the effectiveness of their insulation coating products

or "any other material fact concerning any good or service;"

(2) prohibits Defendants (and their officers, agents, etc.) from making unsubstantiated claims about their coating products;

(3) requires Defendants to notify their customers of the permanent injunction and require the customers to remove any misleading statements about the coating materials from marketing materials that the customers use to resell the products to ultimate consumers;

(4) requires Defendants to acknowledge receipt of the order and seek and obtain written confirmation of notice of the order from all principals, officers, directors, managers, members, and entities related to the Defendants;

(5) requires Defendants to submit a compliance report one year after the entry of the permanent injunction, and provide other types of notice if certain changes occur over a 20-year period;

(6) mandates creation of "certain records for 20 years after entry" of the injunction; and

(7) requires Defendants to submit compliance reports while authorizing continued monitoring by the FTC for an indefinite time period.

(Doc. 18-2 at 3-12.)[3]

The Court finds that conditions (1), (2) and (4) are merited by the seriousness of the violation, the possibility of violations recurring with respect to other products, and Defendants' history. Conditions (1)-(2) are reasonably targeted at the underlying offenses of making false, misleading, and/or unsubstantiated claims about Defendants' insulation coating products. Although the conditions extend beyond the specific product (MultiCeramics Insulation) that is at issue in this action, the Court concludes that prohibiting false, misleading, and/or unsubstantiated claims about other coating products fits within the reasonable range of "fencing in" that will prevent similar types of misconduct from occurring in the future. Condition (4) ensures that Defendants and affiliated persons and entities receive adequate notice of the injunction, which is reasonably tailored to ensure a fair probability of compliance.

The remaining conditions, however, will be modified. Condition (3) extends the

---

[3] The original proposed order also sought a monetary judgment and information necessary to obtain monetary relief and effectuate consumer redress. (Doc. 18-2 at 5-6.) However, the FTC no longer seeks monetary relief in light of *AMG Capital*. (Doc. 21.)

prohibitions of conditions (1)-(2) to Defendants' customers, requiring Defendants to notify the customers of the permanent injunction and seek the abatement of misrepresentations that appear in customers' marketing materials to ultimate consumers. The Court modifies two aspects of condition (3), as follows.

First, as explained in greater detail below, the Court is not persuaded that Defendants should be required to maintain records of these notices for 10 years.

Second, the Court will amend the language of the order to state that Defendants must *request*—not *require*—their customers to cease making any misrepresentations about the coating products. The proposed order, as well as the notice the FTC proposes Defendants must send to customers, could be read to suggest that the customers themselves are bound by the permanent injunction, even though they are nonparties. (Doc. 18-2 at 6, 13.) Federal Rule of Civil Procedure 65(d)(2) provides that only parties, their agents, servants, employees, and attorneys, or other persons who are in active concert or participation with such persons are bound by an injunction. "An injunction binds a non-party only if it has actual notice, and either 'abets the enjoined party' in violating the injunction, or is 'legally identified' with the enjoined party." *CFPB v. Howard Law, P.C.*, 671 F. App'x 954, 955 (9th Cir. 2016) (cleaned up). *See also Saga Int'l, Inc. v. John D. Brush & Co.*, 984 F. Supp. 1283, 1285-86 (C.D. Cal. 1997) (Tashima, J.) ("Courts have uniformly held that [the language of Rule 65(d)] is no more than a way of saying that an injunction binds only the party to the suit, as well as those who aid and abet the party's violation of the injunction."); 11A Charles Alan Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure* § 2956 (3d ed. 1998) ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction."). The language of condition (3) as written in the proposed order could be read to suggest that the permanent injunction *requires* nonparties to undertake certain conduct, even absent a finding that those nonparties have aided and abetted violations or are legally identified with Defendants.[4] Alternatively, to the extent the

---

[4] Of course, if the FTC later determined that a nonparty—who received notice of the injunction and was subject to it by virtue of aiding and abetting or being legally identified

language of condition (3) is intended to require Defendants to ensure that their customers engage in certain conduct (or not engage in certain conduct), such a construction would raise a different set of problems—the FTC has not identified any reason to believe that Defendants possess the legal ability to force their customers to do anything, so condition (3) could result in Defendants being held responsible for conduct over which they have no control. Accordingly, the Court modifies this language, and does not include the FTC's proposed notice (Doc. 18-2 at 13-14) as part of the permanent injunction.

The Court also concludes that the remaining provisions must be modified. Although the FTC's allegations, taken as true, establish that Defendants made false, misleading, and/or unsubstantiated claims about their products, there are no allegations (or evidence) that these misrepresentations resulted in concrete financial or other damage to consumers.[5] Of course, the FTC is not required to prove consumer harm to establish entitlement to an injunction. *Gill*, 71 F. Supp. 2d at 1047, *aff'd*, 265 F.3d 944 (9th Cir. 2001). *Cf. FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1214 (9th Cir. 2019) ("Although in the ordinary case a showing of irreparable harm is required to obtain injunctive relief, no such showing is required when injunctive relief is sought in conjunction with a statutory enforcement action where the applicable statute authorizes injunctive relief."). But the Court considers the extent of the harm when assessing the proper scope of the injunction, because it indicates the seriousness of the violation. *Compare Grant Connect*, 763 F.3d at 1105 (upholding injunction where the defendant "consistently engaged in variations on the same deceptive marketing scheme, which, in its latest iteration alone, [had] defrauded consumers of more than $29 million"). Further, although the misrepresentations have taken place in multiple

---

with Defendants—violated the terms of the injunction, then the FTC could seek appropriate remedies at that time.

[5] The only evidence the FTC proffers of concrete consumer harm is that SuperTherm netted $767,950 in gross receipts from 2015 to 2019. (Doc. 18-1 at 5.) This suggests, at most, that perhaps some number of customers purchased MultiCeramics Insulation and accordingly spent funds on a product whose qualities had been materially misrepresented. Even assuming that such circumstances demonstrate consumer harm, the gross receipts do not distinguish among receipts for purchases of products or services other than MultiCeramics Insulation, so the Court has no way of knowing how much of the receipts are attributable, directly or indirectly, to the misrepresentations.

- 16 -

media over a period of years, there are no allegations or evidence suggesting any of the Defendants engaged in similar or related misconduct in the context of other businesses or products. In short, taking the complaint's allegations as true, what is before the Court is an instance of a two-person insulation business that made a series of misrepresentations about a particular product over a seven-year period. The Court does not minimize this violation, but it is not the fraud of the century. As a result, 10 years of maintaining the notices to customers (Doc. 18-2 at 7), 20 years of submitting compliance notices (*id.* at 9), 20 years of recordkeeping (*id.* at 10), and indefinite compliance monitoring (*id.* at 11-12) are, under the circumstances, unduly broad and burdensome remedies.

The Court will accordingly modify the proposed injunction by shortening the period of all the above conditions to five-year (instead of 10-year, 20-year, or indefinite) time periods. The Court acknowledges that other courts have imposed similar conditions for longer durations, but concludes such cases are distinguishable because they involved conduct that was more egregious or pervasive or involved defendants with more substantial track records of violating the FTC Act. *See, e.g.*, *DiscountMetalBrokers*, 2017 WL 6940502 at *1, 7 (in case where large numbers of consumers were defrauded out of money used to pay for gold or silver, court imposed permanent injunction banning defaulted defendants from marketing investments to consumers, but did not require mandatory compliance reporting); *FTC v. Ideal Fin. Sols., Inc.*, 2016 WL 756527, *1, 4-6 (D. Nev. 2016) (in case involving "wide-ranging scheme fraud scheme" wherein defendants "charged unwitting consumers a fee for financial services never provided," court granted some portions of proposed injunction and denied others and shortened compliance period from 20 to 10 years); *FTC v. Mortgage Relief Advocates LLC*, 2015 WL 11257575, *3-4, 9 (C.D. Cal. 2015) (imposing monitoring provisions as requested by FTC where defendants among other things targeted financially distressed homeowners with misleading representations about providing financial relief and accepted fees without providing the promised results or services). Thus, under these circumstances, the Court concludes that a five-year duration is sufficient. The details of the conditions to be imposed can be found

in the accompanying judgment.

Accordingly,

**IT IS ORDERED** that the FTC's motion for default judgment (Doc. 18) is **granted**. A separate judgment against Defendants will issue, after which the Clerk of Court shall terminate this action.

Dated this 4th day of August, 2021.

Dominic W. Lanza
United States District Judge